**James M. ALEX, et al., Plaintiffs–Appellees,**

**v.**

**CITY OF CHICAGO, Defendant–Appellant.**

**Michael M. McKITTRICK, et al., Plaintiffs–Appellees,**

**v.**

**CITY OF CHICAGO, Defendant–Appellant.**

**Nos. 93–2627, 93–2630.**

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided July 21, 1994.

Thomas A. Woodley (argued), Mulholland & Hickey, Washington, DC, Stephen B. Horwitz, Jacobs, Burns, Sugarman & Orlove, Chicago, IL, for plaintiffs-appellees in No. 93-2627.

Lawrence Rosenthal, Deputy Corp. Counsel, Mardell Nereim (argued), Benna R. Solomon, Susan S. Sher, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for defendant-appellant in No. 93-2627.

Robert S. Sugarman, Stephen B. Horwitz, Jacobs, Burns, Sugarman & Orlove, Chicago, IL, Thomas A. Woodley (argued), Mulholland & Hickey, Washington, DC, for plaintiffs-appellees in No. 93-2630.

Jennifer Naber, Asst. Corp. Counsel, Lawrence Rosenthal, Deputy Corp. Counsel, Mardell Nereim (argued), Kelly R. Welsh, Asst. Corp. Counsel, Benna R. Solomon, Su-

san S. Sher, Jennifer J. Ranger, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for defendant-appellant in No. 93–2630.

Before BAUER and FLAUM, Circuit Judges, and GRANT, District Judge.*

FLAUM, Circuit Judge.

These consolidated cases involve identical claims by current and former paramedic employees of the Fire Department of the City of Chicago that they are entitled to overtime pay for hours worked in excess of 40 hours per week, in accordance with section 7(a) of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1). The City asserts nonliability under section 7(k) of the Act which establishes a limited exemption from the overtime provision for employees in "fire protection activities," 29 U.S.C. § 207(k). There being no material facts in dispute, the plaintiffs and the City filed cross motions for summary judgment. The district court found for the plaintiffs as to liability; the parties then reached agreement as to the computation of damages should the district court's orders survive appellate review.[1] They do.

I.

A.

Because the nature of the paramedics' duties and training is crucial to the application of the relevant law in this area, we will describe the role of paramedics within the Chicago Fire Department as agreed by the parties below. The Fire Department is organized into five divisions: (1) the Bureau of Fire Suppression and Rescue; (2) the Bureau of Fire Prevention; (3) the Bureau of Administrative Services; (4) the Bureau of Support Services; and (5) the Bureau of Emergency Medical Services. Regular fire fighters and rescue personnel fall under the authority of the Bureau of Fire Suppression and Rescue, while paramedics serve in the Bureau of Emergency Medical Services (EMS). Eligibility, qualifications and job classifications are different for paramedics and fire fighters. However, the same collective bargaining unit and agreement covers both paramedics and firefighters, and paramedics are on the same pay scale, receive the same benefits and participate in the same pension fund as firefighters. Paramedics are assigned to ambulances located in Chicago fire stations. Like firefighters, paramedics normally work a platoon schedule consisting of 24 hours on duty, followed by 48 hours off duty, with every fifth workday off—amounting to 120 hours of duty in an eighteen-day work cycle.

The basic mission of the paramedics is to provide emergency medical care, life support (basic and advanced) and transportation to hospitals for injured or ill people. The paramedics are certified by the State of Illinois as Emergency Medical Technicians–Paramedic, and each must undergo at least forty hours per year of continuing education in medical services to maintain certification; the Bureau of EMS provides ongoing training. The paramedics are not trained, expected or allowed to perform fire suppression or rescue services. They may not enter burning buildings or smoke-laden areas and are subject to discipline if they engage in fire fighting activities. Paramedics must remain in an area away from the immediate scene of a fire and do not treat victims until they have been safely evacuated from the fire vicinity. Fire fighters and specialized rescue personnel extricate victims from hazardous situa-

* The Honorable Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. Because the determination of damages in this case will be mechanical and uncontroversial, the district court's orders are appealable. *See Parks v. Pavkovic,* 753 F.2d 1397, 1401 (7th Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985). On a related note, the district court, on the City's motion, entered final judgment on its orders disposing of the plaintiffs' first claims (of their two-claim complaints) pursuant to Rule 54(b). We agree with the City's current position that resort to Rule 54(b) was unnecessary (and indeed inappropriate) because plaintiffs' second "claims" merely stated an alternative ground for relief. *See Indiana Harbor Belt Railroad Co. v. American Cyanamid Co.,* 860 F.2d 1441, 1445 (7th Cir.1988). In their second claims, Plaintiffs' had sought an intermediate overtime recovery as "law enforcement" employees under section 7(k) in the event they were not deemed entitled to full overtime under section 7(a) though not denied recovery altogether as "fire protection" employees under § 7(k).

tions; paramedics do not. They have not been taught how to use, and do not carry, hydraulic jacks, cutting torches, saws, ropes or other extrication equipment. Paramedics may, however, provide life support to stabilize an entrapped victim while fire fighters or rescue personnel are attempting extrication. While paramedics may not work to free a physically entrapped victim, brief deposition testimony indicated that at one time some paramedics (who attended a continuing education program) were shown how to use backboards and similar devices to safely remove injured automobile accident victims from their vehicles.

Paramedics are not automatically dispatched to all fires, crime scenes or accidents; they are sent out only when there is a report of injury or substantial likelihood of injury. In a typical year, at least half of paramedic responses involve nontraumatic, noncardiac medical emergencies; e.g. epileptic seizures, asthma attacks, diabetic reactions, emphysema-related episodes. Less than one percent are fire-related and less than five percent are violence or law-enforcement-related. In 1990, for example, Chicago Fire Department paramedics responded to 212,367 calls: 111,133 (52.3%) were medical emergencies, 79,370 (37.4%) were trauma emergencies, 8,227 (3.9%) were cardiac emergencies, 7,136 (3.4%) were obstetric emergencies, and 2,452 (1.2%) were psychiatric emergencies.[2] (The remaining calls were either for additional units or for non-emergencies.) Of the calls, 1,476 (0.7%) were from fire scenes, 26,590 (12.5%) were from scenes of vehicular accidents (of all sorts), 6,557 (3.1%) were from shooting or stabbing incidents, and 2,600 (1.2%) involved drug overdoses. The Chicago Police Department was present at 52,394 (24.7%) of the response scenes; fire suppression personnel were at 37,875 (17.8%). (Fire suppression personnel sometimes respond to non-fire calls for a variety of reasons not quantitatively categorizable on this record.) When the paramedics are not responding to calls, they spend most of their time cleaning and maintaining equipment and supplies at their stations.

B.

Section 7(a) of the Fair Labor Standards Act (FLSA) requires employers to pay their employees overtime compensation of one-and-one-half times their normal wage for hours worked in excess of forty hours per week. Since 1985, it has been clear that state and local government employers do not enjoy constitutional immunity from the strictures of the Act, which Congress, in 1974, had extended to explicitly cover them. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 533–34, 557, 105 S.Ct. 1005, 1008–09, 1010, 83 L.Ed.2d 1016 (1985). However, section 7(k) of the Act, also added in 1974, provides a partial exemption for public agency employers of law enforcement and fire protection personnel by upping the threshold at which overtime compensation entitlement begins. 29 U.S.C. § 207(k). Under the statutory scheme as put into effect by the Labor Department, employees to whom the fire protection exemption applies do not receive overtime compensation until hours worked during an applicable work cycle exceed a rate of fifty-three hours per week; law enforcement employees are entitled to overtime pay when their work rate exceeds forty-three hours per week. *See* 29 C.F.R. §§ 553.201(a), 553.230(c).

Since April 15, 1986—the date declared by Congress, in the aftermath of *Garcia,* as the compliance deadline for local governments with section 7 of the Act, *see* Pub.L. 99–150, § 2(c)(1)—the City of Chicago has treated Fire Department paramedics as subject to the § 7(k) fire protection exemption by only paying them overtime compensation for hours worked in excess of 136 hours per eighteen-day cycle (i.e. fifty-three hours per week over 18 days). These suits represent an effort by the paramedics to establish that § 7(k) does not apply to them at all, or, in the alternative, applies to them as law enforcement rather than fire protection employees (thus entitling them to overtime pay

2. As a percentage of working time spent on calls, medical emergencies constituted 51.3%, trauma emergencies 35.1%, cardiac emergencies 5.3%, obstetric emergencies 3.4%, and psychiatric emergencies 1.2%.

for work in excess of 110 hours per eighteen-day cycle). Relying on Labor Department regulations and letter rulings interpreting the statutory language, the district court found that Chicago Fire Department paramedics do *not* fall within the scope of § 7(k) and are fully entitled to overtime compensation for hours worked in excess of forty hours per week as generally set out in § 7(a).

II.

Section 7(k) only covers "employee[s] in fire protection activities or ... law enforcement activities." Plaintiffs first contend that this passage alone should dispose of this appeal because its "unambiguous language" does not reach employees whose duties are medical and not related to the extinguishment or control of fires. They are right that when statutory meaning is clear with respect to the issue at bar judicial inquiry normally should end without heed to the embellishments of secondary materials like legislative history, regulations or administrative rulings. *See Connecticut National Bank v. Germain,* — U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *Board of Governors v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). They are wrong, however, to suggest that there is no ambiguity as to whether Fire Department paramedics are employees engaged in "fire protection activities." As the district court noted, "fire protection" has a potentially broader connotative sweep than a phrase like "fire prevention" (or "fire suppression") and can reasonably extend to any activity typically part of a safety-minded response to a fire. Rapidly reacting medical teams performing first-line treatment and triage duties at fire scenes are responding to the very immediate and direct consequences of a fire. Such activities, in a not overly broad sense, protect people from the dangers of fires. That Fire Department paramedics respond to fires much less frequently than to other types of emergencies, most of which do not even involve fire hazards, reflects a question of degree that the unadorned phrasing of the statute does not resolve. We therefore follow established practice, and the lead of other courts that have considered the issue, by turning for further guidance to the explications provided by the governmental branch charged with administering the Act. *See Thomas Jefferson University v. Shalala,* — U.S. ——, ——, 114 S.Ct. 2381, ——, 129 L.Ed.2d 405 (1994); *National Railroad Passenger Corp. v. Boston and Maine Corp.,* — U.S. ——, ———-——, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992); *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *see also Justice v. Metropolitan Government of Nashville,* 4 F.3d 1387, 1392–93 (6th Cir.1993); *Nalley v. Mayor and City Council of Baltimore,* 796 F.Supp. 194, 198 (D.Md.1992); *Horan v. King County,* 740 F.Supp. 1471, 1475–77 (W.D.Wash.1990).[3]

3. There is a snippet of legislative history on point. On the House floor, when the 1974 amendments to FLSA were being discussed, the ranking member and the chairman of the General Labor Subcommittee expressed their belief that section 7(k) "is intended to cover those employees directly employed by a public agency who are engaged in rescue or ambulance activities which are substantially related to fire protection or law enforcement activities. In some instances these rescue or ambulance crews are a part of the fire or police department. In other cases they must be under a separate department of the same public agency, but their activities substantially include rescue and ambulance work associated with fire protection and law enforcement." *See Justice,* 4 F.3d at 1396 n. 2 (quoting 120 Cong.Rec. 8598 (1974)); *see also* 120 Cong. Rec. 7317–18 (1974). Of course, legislative history, especially isolated remarks of individual legislators, *see Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979), could not be used to find ambiguity, or contrary intent, in statutory language that, with respect to a case in hand, is clear on its own terms without rendering nugatory the "plain meaning" canon of construction. Here, however, we conclude, without reference to other sources, that "fire protection activities" is a phrase that reasonably may or may not be understood to encompass Fire Department paramedics who are based at fire stations and whose duties include responding to fire calls. The congressmen's expressed desire to include some EMS workers within the scope of the exemption only serves to reinforce our conclusion that Labor Department guidance in this regard (which, as we shall see, closely tracks the language and tenor of the floor statements) is an appropriate reference.

In 1987, the Labor Department issued regulations dealing with the application of FLSA to public employees, *see* 29 C.F.R. part 553, and devoted a subpart to "Fire Protection and Law Enforcement Employees of Public Agencies" and the nature of their § 7(k) statutory exemptions. Section 553.210, subsection (a), begins by defining "employee ... in fire protection activities" rather narrowly, requiring, among other things, that such an employee be authorized and responsible for "the prevention, control or extinguishment" of fires. However, the subsection concludes by stating that "[t]he term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215." Section 553.215—similarly cross-referenced in § 553.211's definition of "employee ... in law enforcement activities"—is entitled "Ambulance and rescue service employees" and provides as follows:

> (a) Ambulance and rescue service employees of a public agency other than a fire protection or law enforcement agency may be treated as employees engaged in fire protection or law enforcement activities of the type contemplated by sections 7(k) and 13(b)(20) if their services are substantially related to firefighting or law enforcement activities in that (1) the ambulance and rescue service employees have received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel injured in the performance of their respective duties, and (2) the ambulance and rescue service employees are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents. As provided in § 553.213(b), where employees perform both fire protection and law enforcement activities, the applicable standard is the one which applies to the activity in which the employee spends the majority of work time during the work period.
>
> ....
>
> (c) Ambulance and rescue service employees of private organizations do not come within the section 7(k) or section 13(b)(20) exemptions even if their activities are substantially related to the fire protection and law enforcement activities performed by a public agency or their employer is under contract with a public agency to provide such services.

In addition, § 553.212 provides that employees who otherwise would qualify for an exemption under §§ 553.210 or .211 are nonetheless not to be treated as exempt employees if they spend more than twenty percent of their work time "engage[d] in ... nonexempt work which is not performed as an incident to or in conjunction with their fire protection or law enforcement activities." As an example of nonexempt work, the regulation describes "firefighters who work for forest conservation agencies ..., during slack times, plant[ing] trees and perform[ing] other conservation activities unrelated to their firefighting duties."

The parties, to begin with, dispute whether the more elaborate test set out in § 553.215(a) applies to this case at all. The City observes that .215(a) only purports to speak to "[a]mbulance and rescue service employees of a public agency *other* than a fire protection ... agency" and the plaintiffs here *are* employees of the Chicago Fire Department. The City contends that for ambulance employees of public agencies charged with fire protection the regulations contemplate a wholly separate test, turning on whether, as set out in § 553.210(a), "such personnel form an integral part of the public agency's fire protection activities." The district court agreed in principle but relied on .215(a) anyway because, it reasoned, if the plaintiffs' services are not "*substantially related* to firefighting ... activities" under .215(a), they could not be "an *integral part*" of the fire department's "fire protection activities"; that is, linguistically, "integral" implies a tighter fit than "substantially related." The plaintiffs take a different approach. They believe that only one test exists and .215(a) states it, pointing for support to the cross-reference to .215(a) appearing in .210(a) immediately after the "integral part" sentence and also invoking the commonsense appeal of a single test, which would avoid disparities in overtime entitlements between similar workers from city to city because of local differences in emergency service organizations. For their part, the courts are split

as to the independent significance of the "integral part" language. *Compare Wouters v. Martin County, Fla.,* 9 F.3d 924, 931 (11th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 65, — L.Ed.2d — (1994); *Nalley,* 796 F.Supp. at 198; *Alexander v. Kansas City, Kansas,* 1993 WL 393013, *6 (D.Kan. Sep. 23, 1993), *with Justice,* 4 F.3d at 1395; *Bond v. City of Jackson,* 939 F.2d 285, 287 (5th Cir.1991) (applying the cross-reference without comment); *Littlefield v. Town of Old Orchard Beach,* 780 F.Supp. 64, 67 (D.Maine 1992) (same).

We agree with the plaintiffs and the sixth circuit in *Justice* that the regulations only state one test for the § 7(k) exempt status of publicly employed emergency medical personnel. First of all, while .215(a) clearly purports to lay out a test only for public agencies other than fire departments, .210(a) does not so unambiguously pronounce that its "integral part" language states a contrasting test for fire departments. To be sure, by its location within a paragraph classifying fire department employees generally and by referencing the "public agency's fire protection activities", the "integral part" formula implicitly refers only to fire department ambulance personnel. But if the sentence were intended to be more than just precatory, one would expect that it would find the more prominent placement and contain the more laborious phrasing that typically characterize regulatory tests of this sort and do characterize neighboring exemption tests in this subpart. In this light especially, the cross-reference to .215 most likely indicates that the fleshed-out formulation of that section is the appropriate test to apply to ambulance personnel from any public agency. We cannot agree that this cross-reference is superfluous or accidental—§ 553.211(b) repeats it in an analogous reference to ambulance personnel of law enforcement agencies and the previous version of the regulations, issued in 1974, also contains it; or that it is merely organizational, *see, e.g., Nalley,* 796 F.Supp. at 198—the subpart is short and needs no (and contains no other) oddly phrased road markings, and the contextual and common-sense implication that the cross-reference means something substantive is strong. *Cf. Freeman United Coal Mining Co. v. Foster,* 30 F.3d 834, 837–38 (7th Cir.1994). No doubt the scheme could have been set out less clumsily—the opening phrase of .215, especially, implies a dichotomous arrangement [4]—but inartful draftsmanship should not be misidentified as calculated complexity.[5] As the sixth circuit has pointed out, a unitary approach is consistent with the little legislative history on point. *See Justice,* 4 F.3d at 1395–96; *supra* note 3. And more importantly (since we are interpreting regulations), it seems to clearly comport with the relevant *regulatory* history. When the Labor Department issued these regulations, it also addressed outside comments that the regulations as proposed had attracted. *See* 52 Fed. Reg. 2012 *et seq.* (Jan. 16, 1987). In responding to a suggestion that all ambulance personnel employed by a fire department be treated as subject to the section 7(k) exemption as opposed to only those who form an "integral part" of the agency's fire protection services under .210 as adopted, the Department responded as follows:

> The legislative history of the 1974 FLSA Amendments ... clearly indicates that only those employees who are engaged in ambulance or rescue service activities which are *substantially related* to fire protection or law enforcement activities can qualify for these exemptions.... For this reason the Department has not adopted this recommendation.

4. The last sentence of .215, constituting subsection (c), adds to the suggestion of intricate classification in this area by formally announcing that privately employed ambulance workers do not fall within the § 7(k) exemption even if "their activities are substantially related to the fire protection ... activities performed by a public agency...." This too could have been said much more straightforwardly (or not at all) since by its own terms § 7(k) clearly only applies to public agency employers.

5. The "plain language" of .215, or more precisely a negative inference drawn from the plain language—referring to employees of "other" agencies—does not resolve matters here, as the City insists, because the language of *.210,* the appropriate starting point of our analysis, almost as plainly counters that inference.

52 Fed.Reg. 2022 (original emphasis). And in responding to the same objection to the "integral part" language of § 553.211, the Department explained:

> As discussed above in the analysis of the comments on § 553.210, the Congress clearly intended that only those ambulance and rescue service employees whose activities are substantially related to fire protection or law enforcement activities can qualify for exemption under sections 7(k) or 13(b)(20).

*Id.* By echoing the locution of .215 in explaining the "integral part" language of .210, the Labor Department has confirmed what the cross-reference "See § 553.215" strongly implies: that the substantial relatedness of the services of a fire department's ambulance personnel to the agency's fire protection activities, as explicated in .215, tests such personnel's eligibility for section 7(k) exemption just as it tests all publicly employed ambulance personnel's eligibility for the exemption. Section 553.210 describes in general terms what § 553.215 expounds in more detail.[6] And so it is with the latter section that our inquiry proceeds.

Section 553.215(a) sets out a two-part, conjunctive test for determining whether ambulance and rescue service employees are engaged in fire protection or law enforcement activities for the purpose of the statutory exemption: (1) Have they "received training in the rescue of fire, crime, and accident victims...."?; and (2) Are they "regularly dispatched to fires, crime scenes, riots, natural disasters and accidents"? Because we conclude that this case is controlled by the first prong of the test, we need not and do not reach the difficult question of what constitutes regular dispatch on qualifying calls (or, in light of the undisputed facts of the case, the seemingly more clear-cut issue of whether § 553.212's twenty-percent-non-exempt-work ceiling has been reached here).

What did the Department intend by focusing attention on ambulance and rescue workers' "training in the rescue of ... victims"? All EMTs are surely trained to provide some measure of emergency medical care to those in need; and the alleviation of any danger to health or physical well-being, whether presently medical (i.e. an injury or malady already within the body) or still only potential so (i.e. some external harm threatening the body), can constitute a rescue in a permissible usage of the word. But if the Department was not seeking to fashion an illusory dividing line in this first prong of .215(a)—one which all emergency service personnel would cross almost by definition—"training in ... rescue" must have been meant in a more restrictive sense. A 1987 Administrative Letter Ruling confirms this notion. The letter ruling explains:

> Under these circumstances, the term "rescue" refers to actions taken to free a victim from imminent danger or harm by the most expeditious means. In many cases, this may require an EMT to take action beyond merely applying emergency medical treatment such as bandaging, administering oxygen, or transporting an individual to a hospital. For instance, there may be situations where the EMTs, as the first responders at the scene of an automobile accident, must extricate an injured person from a vehicle in order to begin treatment and preparation for movement as soon as possible. As stated in the material enclosed with your inquiry, the "EMT will

6. Nothing in the several letter rulings that the Wage and Hour Division has issued in this area weakens this conclusion. The letters for the most part simply restate the regulatory rules and follow their structure. *See, e.g.,* Adm.Ltr.Rul. (May 7, 1993), *reprinted in Fair Labor Standards Handbook,* App. III at 339 (April 1994); Adm. Ltr.Rul (Oct. 21, 1987), *reprinted in Fair Labor Standards Handbook,* App. III at 174 (March 1988). The 1993 Letter Ruling does say that "the application of § 7(k) to EMS employees of public agencies that are not an integral part of fire protection or law enforcement agencies must be made on a case-by-case basis...." However, taken in context, this statement does not imply that "integral part" and "substantially related" are distinct standards. Rather, it only explains that because EMS employees of nonspecialized public agencies can be expected to receive "[s]ome calls ... related to law enforcement emergencies, some ... related to fire protection emergencies, and some ... related to medical emergencies not attributable to either law enforcement or fire protection," properly classifying them as nonexempt, fire-protection exempt or law-enforcement exempt will typically "depend[] on the nature of the EMS calls serviced." Adm.Ltr.Rul. (May 7, 1993).

have to use whatever means are available to gain access to the patient and disentangle him from the wreckage...." This means that an EMT must be properly trained to operate special types of equipment, such as hydraulic "spreaders" or chemical foam extinguishers, in case they are available for their use at the accident scene. Therefore, we interpret the requirement that an EMT be "trained to rescue" as meaning that the individual has knowledge of basic life-saving procedures and life-support procedures (i.e. CPR, administering oxygen, and extrication techniques). However, it is not necessary for an EMT to routinely perform any or all of these procedures in order to meet the requirements of the first test referred to above.

You have indicated that the EMTs who are the subject of your inquiry are not trained to rescue fire victims by removing them from burning buildings or other structures. This would require (1) extensive training in fire-suppression and evacuation techniques and (2) special equipment and protective clothing which could not be carried or transported by EMT crews. Under these circumstances, the obligation of an EMT to "rescue" a victim is limited by the nature of the event (fire) and the ability of the EMT to safely and efficiently provide assistance. Therefore, it is our opinion that an EMT need not be trained in fire-suppression or evacuation procedures in order to be engaged in activities which are "substantially related" to firefighting or law enforcement.

Adm.Ltr.Rul. (October 9, 1987), *reprinted in Fair Labor Standards Handbook,* App. III at 173 (March 1988). The thrust of this letter is clear. While EMTs need not in fact be firefighters to fall under § 7(k), their training in "rescue" must go beyond the purely medical. They must be able to extricate victims from *external* threats to life and limb—" 'rescue' refers to actions taken to free a victim from imminent danger or harm ... beyond merely applying emergency medical treatment"; "an EMT must be properly trained to operate special types of equipment, such as 'hydraulic spreaders' ..."; "[t]herefore ... 'trained to rescue' ... mean[s] that the individual has knowledge of basic lifesaving procedures and life-support procedures (i.e. CPR, administering oxygen, *and* extrication techniques)." Indeed, this distinction between training in the relief of medical danger and training in administering to surrounding dangers is a relatively unartificial way to put into effect the subclassification of emergency ambulance personnel contemplated in .215. Other circuits that have interpreted the regulation and the letter ruling agree that instruction in extrication, that is the freeing from physical entanglement or other environmental danger, is a *sine qua non* of "rescue" training under § 553.215. *See Justice,* 4 F.3d at 1397–98; *O'Neal,* 980 F.2d at 678. *But see Bond,* 939 F.2d at 288 (apparently not distinguishing extrication from purely medical rescue efforts).

It is undisputed that Chicago Fire Department paramedics do not perform and are not trained to perform "rescue" activities beyond those of a medical nature. They are not trained to free victims from "imminent danger or harm by the most expeditious means." Such duties are explicitly reserved for firefighters and special rescue personnel and are off-limits to the paramedics. While some paramedics may have been trained in the safe movement of victims by use of backboards, the City has not shown that equipment of this sort is other than medical in nature in that it is designed to prevent aggravation of certain kinds of existing wounds and injuries and does not facilitate or enable paramedics to deliver victims from the threat of external perils.[7] Because Chicago has carefully delegated tasks and training of the latter type to personnel other than paramedics, § 553.215 of the regulations directs that it may not treat paramedics as engaging in

7. Because the City as employer bears the burden of proving the applicability of the FLSA exemption, *see Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Klein v. Rush–Presbyterian–St. Luke's Medical Center,* 990 F.2d 279, 283 (7th Cir.1993), it could avoid summary judgment only by making a showing sufficient to establish that the paramedics were trained to rescue victims from external dangers. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

exempt status fire protection or law enforcement activities under § 7(k) of the statute. Therefore, the plaintiffs are entitled to summary judgment.

AFFIRMED.