GENERAL ELECTRIC COMPANY AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
General Elec. Co. v. Commissioner
Docket No. 14715-92
United States Tax Court
T.C. Memo 1995-306; 1995 Tax Ct. Memo LEXIS 313; 70 T.C.M. (CCH) 39; July 13, 1995, Filed *313 During its 1979 and 1980 taxable years, P, a domestic corporation, manufactured aircraft engines and thrust reversers, and sold these parts to airframe manufacturers. The airframe manufacturers assembled the parts into airframes and then sold the finished products (aircraft) to foreign purchasers. P sold the engines and the reversers to the airframe manufacturers through its wholly owned subsidiary, D, a domestic international sales corporation (DISC). P paid D commissions on these sales, and P now claims additional DISC commission deductions with respect to these commissions. Held: P is not entitled to additional DISC commission deductions because the engines and reversers were "subject to * * * assembly" after P sold them to the manufacturers. Sec. 1.993-3(d)(2)(iii), Income Tax Regs.
For petitioner: Mark K. Beams, Laurence A. Hoch, and Craig L. Sigworth. For respondent: Lewis R. Mandel and Christopher B. Sterner. LARO
LARO
MEMORANDUM OPINION LARO, Judge: Respondent determined deficiencies of $ 23,847,089 and $ 221,968,862 in petitioner's 1979 and 1980 Federal income taxes, respectively. Respondent reflected this determination in a notice of deficiency issued to petitioner *314 on April 2, 1992. Petitioner petitioned the Court on June 30, 1992, to redetermine respondent's determination. The parties submitted the case to the Court without trial. [1] See Rule 122. We must decide whether aircraft engines (engines) and thrust reversers (reversers) sold by General Electric Co. (GE) to Boeing Aircraft, Inc. (Boeing), and McDonnell Douglas Corp. (McDonnell Douglas) were "export property" under section 993(c)(1)(B). Our decision hinges on whether the engines and reversers were "subject to any * * * assembly" under section 1.993-3(d)(2)(iii), Income Tax Regs., following their sale to Boeing and McDonnell Douglas. [1]
We hold that the engines and reversers were not "export property" because they were "subject to * * * assembly" following their sale. Unless otherwise indicated, section references *315 are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Background
The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioner's principal office was in Fairfield, Connecticut, when it petitioned the Court. GE, the common parent of the affiliated group of corporations that makes up petitioner, manufactures sophisticated engines and reversers. GE sells the engines and reversers to foreign and domestic buyers. The engines power large aircraft. The reversers reverse the thrust of the engines to decelerate the aircraft during landings. GE sold both the subject engines (GE engines) and the subject reversers (GE reversers) to Boeing and McDonnell Douglas during GE's 1979 and 1980 taxable years. GE made these sales through its wholly owned subsidiary, General Electric International Sales Co. (International). International qualified as a "domestic international sales corporation" (DISC), see sec. 992(a)(1), during those years. International was GE's export sales agent, and was entitled to receive commissions on GE's export sales. The commissions equaled the maximum *316 commissions permitted to be received by a DISC under section 994. Boeing and McDonnell Douglas manufacture airframes. Basically, airframes are the full aircraft less engines and reversers. After manufacturing the airframes, Boeing and McDonnell Douglas install engines and reversers thereon and deliver the finished aircraft to foreign purchasers for their use, consumption, or disposition outside of the United States. For the years in issue, GE accrued the following income from its sale of GE engines and GE reversers: [2]
GE Engines GE Reversers 1979
$ 203,255,148
$ 38,634,051
1980
306,506,587
61,984,661
Each GE engine was an identifiable product that the aviation industry viewed as having a separate and independent identity throughout its useful life. Each reverser was viewed by the aviation industry as part of the airframe throughout the reverser's useful life. The Federal Aviation Administration *317 (FAA) supervises and regulates the manufacture of aircraft engines and airframes in the United States. The FAA maintains separate records for the ownership of aircraft engines and the ownership of airframes. The FAA views engines as separate and distinct items. Each engine has a separate serial number that allows the engine to be tracked throughout its useful life by the FAA, GE, and the airline that owns the engine. [3]
During the years in issue, the FAA issued Aircraft Engine Type Certificates and Aircraft Engine Production Certificates to GE with respect to its engines. An Aircraft Engine Type Certificate signifies that the FAA formally approved the manufacturer's design for manufacturing the engines. An Aircraft Engine Production Certificate signifies that the FAA formally approved the quality control system for the manufactured engines based on certain airworthiness standards. *318 Airframe manufacturers were required to obtain separate Aircraft Engine Type Certificates and Aircraft Engine Production Certificates, as well as Export Certificates of Airworthiness, [4] for their aircraft powered by engines. Each application that Boeing and McDonnell Douglas submitted for an Export Certificate of Airworthiness was required to separately identify the serial numbers of the engines attached to the airframes. Engines cannot be installed on an airframe until the engines have been "built-up." The "building-up" process involves attaching to each engine over 2,000 parts received from more than 40 different vendors. The process involves attaching Quick Engine Change Hardware (QECH) that, in part, permits the installation *319 of the engine on the airframe, permits the engine to power the aircraft's operating system, and permits the attachment of various connectors designed to transmit information concerning the operating system to the airframe's cockpit. The building-up process took approximately 110 to 160 hours during the years in issue. Neither Boeing nor McDonnell Douglas performed directly any of the building-up activities; they subcontracted the work to third parties. After build-up, four bolts were used to attach the engines to the airframe's wing pylon. This process took approximately 3 hours. The reversers and their external coverings were then attached to the airframe using additional bolts. This installation took another 60 to 65 hours. For safety reasons, aircraft engines have a stringent maintenance regime. After build-up, GE engines were designed to be quickly and easily separated from the airframe. [5] This design was intended to expedite maintenance of the GE engines and installation of a different GE engine to the airframe. The ability to interchange GE engines maximized airframe productivity by shortening the time an airframe had to be grounded while an engine was undergoing maintenance. *320 An engine removed from one aircraft for maintenance was usually reinstalled on another when the maintenance was complete. Alternatively, the engine was stored and held as a "ready spare" until needed. An active secondary market also existed for the purchase and sale of used engines and aircraft. The QECH and the engines were subject to independent maintenance schedules. After a GE engine was detached from the airframe for maintenance, the QECH was removed and pooled with similar QECH. The GE engines and the originally attached QECH were usually decoupled from each other and from the airframe to which they were originally attached. The process of: (1) Removing the GE engine for maintenance, (2) removing the QECH from the engine, (3) separately maintaining the GE engine and the QECH, (4) attaching different QECH to the GE engine, (5) attaching the original QECH to different GE engines, and (6) substituting a different GE engine on the original airframe, *321 continued at 12- to 15-month intervals over the useful life of each GE engine. During all years relevant herein, none of the major airframe manufacturers in the world manufactured aircraft engines. Whenever an airframe manufacturer entered into an agreement to sell a new aircraft to an airline, the manufacturer would require the airline to select the make of the aircraft engines that it wanted to power the airframe. [6] The airframe manufacturer would then purchase the engines from the engine manufacturer selected by the airline. GE actively solicited orders for its engines and reversers directly from prospective airline purchasers, both foreign and domestic. GE did so without regard to whether: (1) The ultimate purchase would occur by the airline's selection of the GE engines in purchasing an aircraft from an airframe manufacturer *322 or (2) the airline would purchase the engines and reversers directly from GE. GE advertised its products in a number of international and domestic aviation publications. Whenever GE learned that an airline might be interested in purchasing engines and reversers, GE contacted and met with the airline, described the advantages of GE's products, and negotiated the terms that would apply if the airline chose to purchase GE's products. When a foreign airline agreed to use GE's products on a newly purchased aircraft, GE and the airline generally entered into an agreement (separate from the aircraft purchase contract) specifying the discounts and allowances (e.g., cash rebates, free parts, free upgrade kits, advertising allowances) that GE would provide the airline in return for its purchase of a new aircraft equipped with GE engines and GE reversers. As a variation to this approach, GE sometimes executed a general agreement as a result of direct marketing activities conducted before the airline was ready to make a purchase. The general agreement specified the terms that would apply if the airline decided to purchase products (either directly or from an airframe manufacturer) at that time *323 or in the future. With respect to each of its sales of the GE engines and GE reversers, GE agreed to provide some type of discount or allowance to the foreign airline in return for the airline's agreement to use GE products on a new aircraft. The costs of the GE engines and the GE reversers were approximately 18 percent and 1.5 percent, respectively, of the total cost of the finished aircraft to which they were attached. At the time GE shipped each of the GE products at issue, GE knew the identity of the foreign airline that was expected to receive a new aircraft that included GE's products. Discussion
We must decide whether the GE aircraft engines and reversers sold to Boeing and McDonnell Douglas were "export property" under section 993(c)(1)(B). Central to our decision is whether the engines and reversers were "subject to any * * * assembly" under section 1.993-3(d)(2)(iii), Income Tax Regs., following their sale to Boeing and McDonnell Douglas. The Congress enacted the DISC provisions (secs. 991 through 997) as part of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, 535. The Congress did so in order to promote the growth of exports from the United States by allowing *324 domestic corporations to avail themselves of tax deferral benefits that were comparable to the favorable tax benefits enjoyed by domestic corporations using foreign subsidiaries to produce and sell goods abroad. Brown-Forman Corp. v Commissioner, 94 T.C. 919, 924-925 (1990), affd. 995 F.2d 1037 (6th Cir. 1992); CWT Farms, Inc. v. Commissioner, 79 T.C. 1054, 1065 (1982), affd. 755 F.2d 790 (11th Cir. 1985); H. Rept. 92-533 (1971), 1972-1 C.B. 498, 529; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 609. The DISC provisions were part of a larger package of revisions to the Code designed to stimulate economic activity. The DISC provisions were intended to increase the United States exports and improve our balance of payments. [7]LeCroy Research Systems Corp. v. Commissioner, 751 F.2d 123, 124 (2d Cir. 1984), revg. T.C. Memo. 1984-145; S. Rep. 92-437 (1971), 1972-1 C.B. at 559; *325 Under the DISC regime, a DISC provides a deferral mechanism for a portion of the Federal income tax that is payable on income derived from exports. The DISC itself is not taxed. Sec. 991. Rather, the DISC's shareholders (commonly a parent corporation) are currently taxed on only a portion of the DISC's earnings that is deemed distributed to the shareholders on the last day of the DISC's taxable year. Sec. 995(b)(1). Taxation of the remainder of the DISC's earnings is deferred until the earlier of the time that these earnings are actually distributed to the shareholders, section 996(a)(1), a shareholder disposes of the DISC stock in a taxable transaction, section 995(c), or the corporation ceases to qualify as a DISC, sec. 995(b)(2). [8]St. Jude Medical, Inc. v. Commissioner, 97 T.C. 457, 462 (1991), affd. in part, revd. on another issue 34 F.3d 1394 (8th Cir. 1994); Goldberger, Inc. v. Commissioner, 88 T.C. 1532, 1542 (1987). *326 A DISC operates on either: (1) A buy-sell basis; i.e, it takes title to the property to be exported, or (2) commission basis; i.e., it functions as a commission agent for export sales. St. Jude Medical, Inc. v. Commissioner, supra, at 463; Brown-Forman Corp. v. Commissioner, supra, at 924-925. When the income of the DISC consists of commissions from sales of its parent's export property, as petitioner contends is the case here, the parent may compute its taxable income for the year of sale by deducting 100 percent of the DISC's commission income.[9]Longview Fibre Co. v. Commissioner, 71 T.C. 357 (1978). DISC benefits are available to domestic corporations that meet the five requirements set forth in section 992(a)(1). One of these requirements mandates that at least 95 percent of the corporation's gross receipts must be "qualified export receipts". [10]Sec. *327 992(a)(1)(A). The "qualified export receipts of a corporation" include gross receipts from the sale, exchange, or other disposition of "export property". Section 993(a)(1)(A). The term "export property" includes "property * * * manufactured * * * in the United States by a person other then a DISC, * * * [and] held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption or disposition outside the United States". Sec. 993(c)(1)(B). In the case at bar, the relevant property will be export property if GE's sale *328 of the property meets the "destination test" of section 1.993-3(d)(2), Income Tax Regs.[11] See also sec. 1.993-3(d)(1), Income Tax Regs. If the destination test is not met, the property will not be "export property", and DISC benefits will not be available with respect to the property. See Sim-Air, USA, Ltd. v. Commissioner, 98 T.C. 187, 190-195 (1992). In relevant part, section 1.993-3(d)(2), Income Tax Regs, provides: (2) * * * the destination test in this subparagraph is satisfied with respect to property sold or leased by a seller or lessor only if it is delivered by such seller or lessor (or an agent of such seller or lessor) * * *
* * * (b) Within the United States to a purchaser *329 or lessee, if such property is ultimately delivered, directly used, or directly consumed outside the United States * * * by the purchaser or lessee (or a subsequent purchaser or sublessee) within 1 year after such sale or lease, * * * (iii) In no event is the destination test of this subparagraph satisfied with respect to property which is subject to any use (other than a resale or sublease), manufacture, assembly, or other processing (other than packaging) by any person between the time of the sale or lease by such seller or lessor and the delivery or ultimate delivery outside the United States described in this subparagraph.
In its capacity as GE's export agent, International sold GE engines and GE reversers to Boeing and McDonnell Douglas. International did not sell them airframes or finished aircraft. The question is whether the GE engines and the GE reversers qualify as "export property." We look to the limitation on the destination test prescribed in section 1.993-3(d)(2)(iii), Income Tax Regs. Petitioner contends that this limitation embraces only the assembly of the engines and reversers themselves. According to petitioner, the GE engines and GE reversers were *330 fully assembled before delivery to Boeing and McDonnell Douglas. Petitioner also argues that the aviation industry and FAA regulations recognize the GE engines as separate from the aircraft. We disagree with petitioner's interpretation of section 1.993-3(d)(2)(iii), Income Tax Regs. Contrary to petitioner's claim, the limitation prescribed therein embraces the assembly of the GE engines and GE reversers onto the airframes. We find support for our interpretation in the following excerpt from the legislative history of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, which enacted the DISC provisions. The bill specifies that the following are qualified export receipts -- (1) Receipts from the sale of export property (as discussed subsequently, this generally means property such as inventory manufactured or produced in the United States which is sold for direct use, consumption or disposition outside the United States or to an unrelated DISC for such purpose. Thus, a sale of property to an American manufacturer for incorporation in a product to be exported would not be considered for this purpose as an export sale). [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 532; *331 S. Rept. 92-437 (1971), 1972-1 C.B. 559, 613; emphasis added.]
Accordingly, the GE engines and GE reversers were not "export property" under section 1.993-3(d)(2)(iii), Income Tax Regs., because they were "subject to * * * assembly" by Boeing and McDonnell Douglas before disposition of the finished product outside of the United States. [12] Boeing and McDonnell Douglas assembled the GE engines and GE reversers onto airframes before the aircraft were delivered abroad. After being installed on the airframe, the GE engines and reversers became a functional and essential part of the aircraft. The GE engines and the GE reversers required assembly to the airframe in order for the engines, reversers, and airframe to perform their intended use. The engines and the reversers obviously were essential to propel the aircraft into flight and to power its operating system. *332 We hold that the GE engines and the GE reversers were not "export property" under section 1.933-3(d)(2)(ii), Income Tax Regs. In so holding, we have considered all arguments made by petitioner and, to the extent not discussed above, find them to be without merit. An appropriate order will be issued. Footnotes
1. The parties have settled many of the issues raised by the pleadings. This opinion, however, does not resolve all of these issues. The case will remain open pending a final resolution of the unresolved issues.↩
2. GE did not treat this property as "export property" on either its 1979 or 1980 Federal income tax return.↩
3. Various other aircraft-related items also have unique serial numbers that allow the items to be tracked throughout their useful lives.↩
4. An Export Certificate of Airworthiness is issued by the FAA to exporters of aircraft or aircraft engines, and certifies that the product being exported complies with the airworthiness requirements of the United States as well as any special airworthiness requirements of the importing country.↩
5. The QECH was also fashioned to be quickly separated from the engine.↩
6. Three of the larger makers of aircraft engines are GE, Pratt & Whitney, and Rolls Royce. Pratt & Whitney is a United States manufacturer. Rolls Royce is not a United States manufacturer.↩
7. The DISC provisions were narrowed by sec. 802 of the Deficit Reduction Act of 1984 (DRA), Pub. L. 98-369, 98 Stat. 494, 997 is change in law was primarily due to complaints from foreign countries that the DISC provisions violated the General Agreement on Tariffs and Trade. See Staff of the Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 1037, 1041 (J. Comm. Print 1985). Sec. 801 of the DRA created a similar vehicle; i.e., the Foreign Sales Corp. (FSC), in secs. 921 through 927 to carry forward the Congress' intent to stimulate United States exports. Many of the FSC provisions, including the definition of export property in sec. 927, mirror (or are substantially similar to) the corresponding DISC provision.↩
8. For taxable years beginning after 1984, the Congress curtailed the benefit of DISC deferral by requiring that DISC shareholders pay an annual interest charge on the shareholder's DISC-related deferred tax liability. Sec. 995(f)(1). See generally sec. 1.995(f)-1, Proposed Income Tax Regs., 52 Fed. Reg. 10290↩ (Mar. 31, 1987).
9. The DISC's commission income is determined under sec. 994(a).↩
10. Such a requirement is designed to ensure that substantially all of the DISC's assets are devoted to exporting. LeCroy Research Sys. Corp. v. Commissioner, 751 F.2d 123, 124 (2d Cir. 1984), revg. T.C. Memo. 1984-145; Advance Intl., Inc. v. Commissioner, 91 T.C. 445, 453 (1988); H. Rept. 92-533 (1971), 1972 C.B. 498↩, 529.
11. Property is sold for direct use, consumption, or disposition outside the United States if the sale satisfies all three tests listed in sec. 1.993-3(d)(1), Income Tax Regs.↩ Because the parties have limited their discussion to only one of these tests, i.e., the destination test, we do likewise.
12. We interpret the word "assembly" according to its plain meaning. See TennesseeValley Auth. v. Hill, 437 U.S. 153, 185 (1978); United States v. American Trucking Associations, 310 U.S. 534, 543↩ (1940). The word "assembly" means: "4. a fitting together of parts to make a whole, as in manufacturing automobiles, etc." Webster's New World Dictionary of the American Language 82 (3d ed. 1978).