**GENERAL ELECTRIC COMPANY and Subsidiaries, Petitioner–Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 99–4227.

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 2001.

Decided April 2, 2001.

Thomas J. Kavaler, Cahill Gordon & Reindel, New York, NY, (L. Howard Adams, Benjamin J. Cohen, George Wailand, Jay Geiger, Cahill Gordon & Reindel; Mark K. Beams, Patricia M. Lacey, General Electric Company, of counsel), for Petitioner–Appellant.

Donald B. Tobin, Tax Division, Department of Justice (Paula M. Junghans, Acting Assistant Attorney General, Tax Division, Department of Justice, David English Carmack, Tax Division, Department of Justice, of counsel), for Respondent–Appellee.

Before: KEARSE, JACOBS, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

The question presented is the meaning of "export property" under the Domestic International Sales Corporation ("DISC") program established by the Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 497 ("the Act" or "the Revenue Act"). In a Memorandum Opinion entered on July 13, 1995, the United States Tax Court (David Laro, *Judge* ) held that petitioner-appellant General Electric Company and its Subsidiaries ("GE") was not entitled to certain tax benefits under the DISC program because aircraft engines ("engines") and thrust reversers [1] ("reversers") sold by GE to Boeing Aircraft, Inc. ("Boeing") and McDonnell Douglas Corporation ("MDC"), and attached by Boeing and MDC to airframes [2] that they had produced for export, did not constitute "export property" as defined by the Act. *See General Elec. Co. & Subsidiaries v. Commissioner,* 70 T.C.M. (CCH) 39 (1995). The Tax Court (Mary Ann Cohen, *Judge* ) reduced the 1995 Memorandum Opinion of Judge Laro to judgment on September 24, 1999, and it is that judgment from which GE now appeals.

As to the engines, we hold (1) that the Act is, in relevant part, ambiguous, and that we must therefore defer to the pertinent regulations promulgated by the United States Department of the Treasury ("regulations"); and (2) that under the relevant regulations the engines were not "subject[ed] ... to ... assembly ... or other processing," Treas. Reg. § 1.993–3(d)(2)(iii) (1977), by being attached to the airframes. Accordingly, we reverse the Tax Court's judgment as to the engines, and remand the cause for entry of judgment as to the engines in favor of GE.

As to the reversers, we note (1) that the Tax Court did not differentiate in its analysis between engines and reversers and (2) that there are potentially material differences in this context between them. Ac-

---

1. The parties stipulated that a thrust reverser is a "[a] product containing the aerodynamic surfaces, actuators and associated fasteners used to redirect airflow for the purpose of decelerating the Aircraft during landing after touchdown."

2. As the Tax Court put it, airframes are "[b]asically ... the full aircraft less engines and reversers."

cordingly, we vacate the Tax Court's judgment as to the reversers, and remand the cause for further consideration in light of this opinion.

## I. BACKGROUND

### A. RELEVANT STATUTES AND REGULATIONS

■ Congress created the DISC program to improve the nation's balance of payments by increasing our exports, and the program's chosen method for increasing exports was to provide United States firms with tax incentives for shipping their products abroad.[3] *See* H. Rep. No. 92–533 (1971), *reprinted in* 1971 U.S.C.A.A.N. 1825, 1831; Sen. Rep. No. 92–437 (1971), *reprinted in* 1971 U.S.C.A.A.N.1918, 1928.

To the extent relevant here, the DISC program worked [4] as follows: A corporation qualifying as a DISC was not itself subject to federal income tax. *See* I.R.C. § 991.[5] Rather, a portion of the DISC's taxable income earned in connection with

sales of "export property" was deemed distributed to (and taxable to) the DISC's shareholders in the taxable year in which the income was earned by the DISC. *See id.* § 995(b)(1)(E) (referring to, *inter alia*, I.R.C. § 995(e)(4)(A) (referring to I.R.C. § 993(a)(1)(A))). The remaining portion of taxable income earned by the DISC in connection with export property sales was generally not subject to federal income tax until it was distributed by the DISC, the DISC stock was sold, or the corporation ceased to qualify as a DISC. *See id.* §§ 995(b)(2), 995(c), 996(a)(1). This tax deferral on an otherwise immediately taxable portion of net income was the core benefit to firms of exporting their products through a DISC. *See LeCroy Research Sys. Corp. v. Commissioner*, 751 F.2d 123, 124 (2d Cir.1984).

Under the Act, "export property" is property that, *inter alia*, is "held primarily for sale ... by ... a DISC, for direct use,

**3.** There were two aspects of the stated logic of using tax incentives as the instrument for boosting exports. First, some of our major trading partners were using their tax laws to encourage exporting by their domestic firms; providing tax incentives for United States firms to export their products was seen as a way of leveling the international playing field. *See* Sen. Rep. No. 92–437 (1971), *reprinted in* 1971 U.S.C.A.A.N.1918, 1996; H. Rep. No. 92–533 (1971), *reprinted in* 1971 U.S.C.A.A.N. 1825, 1872; *cf.* Department of the Treasury, Internal Revenue Service, CUMULATIVE BULLE-TIN, 1972–1 at 679 (Jan.-June 1972) ("Under the DISC legislation United States exporters can now receive ... tax treatment for their export income more comparable to that afforded by many foreign countries to their exporters."). Second, before the DISC program was established, United States firms that exported their products through domestic corporations received less favorable tax treatment than U.S. corporations that manufactured and distributed their products abroad through foreign subsidiaries; the DISC program was intended to eliminate this disadvantage. *See LeCroy Research Sys. Corp. v. Com-*

*missioner*, 751 F.2d 123, 124 (2d Cir.1984); *The Revenue Act of 1971: Hearings on H.R. 10947 Before the Senate Comm. on Finance*, 92d Cong., 1st Sess., 15, 28, 32–33, 35–36 (1971) (statement and testimony of Treasury Secretary Connally). By doing so, Congress apparently intended to "encourage[ ] [U.S. firms] to establish [*domestic* ] subsidiary corporations for the purpose of exporting the products of the parent." Frank D. Hill & Dee A. Replogle, Jr., *The Wonderful World of DISC*, 25 OKLA. L.REV. 381, 381 (1972).

**4.** The DISC program was greatly narrowed by the Tax Reform Act of 1984, and DISCs have been all but replaced by Foreign Sales Corporations. *See* John M. Gray, *Recent Development, Taxation: Foreign Sales Corporations Replace Domestic International Sales Corporations—Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494*, 26 HARV. INT'L L.J. 293 (1985).

**5.** All references to sections of the "I.R.C." are to sections of the Internal Revenue Code of 1954 as in effect for 1979 and 1980—the taxable years in issue here.

consumption, or disposition outside the United States." I.R.C. § 993(c)(1)(B) (" § 993"). Under the pertinent regulations promulgated by the Department of the Treasury, "[p]roperty is sold ... for direct use, consumption, or disposition outside the United States if such sale ... satisfies the destination test."[6] Treas. Reg. § 1.993–3(d)(1)(i). In turn, the destination test is not satisfied "with respect to property which is subject to any use ... manufacture, assembly, or other processing (other than packaging) by any person between the time of the sale ... by such seller ... and the delivery or ultimate delivery outside the United States." *Id.* at § 1.993–3(d)(2)(iii).

### B. Relevant Facts & Procedural History

The parties have stipulated to the following facts. Further facts are discussed below as relevant. *See post* Sections II.A, II.B.

During the 1979–1980 period, when airframe manufacturers Boeing or MDC received orders from foreign airlines for new aircraft, they asked the foreign airlines to choose the "make" of the engines and reversers to be installed on the aircraft that they had ordered. If GE-manufactured engines or reversers were selected, Boeing or MDC would purchase the engines or reversers from GE, install them on an airframe in the United States, and deliver the fully assembled aircraft (including engines, reversers, and airframe) outside of the United States to the foreign airline.

By notice of deficiency dated April 2, 1992, the Commissioner of Internal Revenue ("the Commissioner") informed GE that it had paid insufficient federal income taxes for 1979 and 1980. On June 30, 1992, GE initiated this action by petitioning the Tax Court for a redetermination of the deficiency.

In its petition for redetermination and in its second amendment to the petition, GE argued, *inter alia,* that it was entitled to a refund for federal income taxes it had paid for 1979 and 1980 based on commissions it could have paid to one of its wholly owned subsidiaries in connection with the above-described sales of engines and reversers to Boeing and MDC. The subsidiary in question was a DISC called General Electric International Sales Corporation ("GEISCO"),[7] and the basis of GE's claim was that the engines and reversers constituted "export property" within the meaning of § 993. *See ante* Section I.A (describing tax benefits available to DISC owners—here, GE—as to income earned by a DISC in connection with sales of export property).

The Tax Court rejected GE's argument. The Court held that the engines and reversers were not export property, and therefore that GE was not entitled to claim DISC benefits on the basis of them. *See General Elec. Co.,* 70 T.C.M. at 43. The Tax Court entered judgment in accordance with this holding, and GE then filed this timely appeal. We have subject matter

---

**6.** Commentators have observed that a basic purpose of the destination test was to ensure that DISC benefits were available only to "true exports." *See* William L. Bricker, Jr., *DISC Export Property,* 3 Int'l Tax J. 439, 445 (1977); Hill & Replogle, *ante* note 3, at 386 (noting that the destination test "limits DISC benefits to a situation where there has been a true export"); *cf.* Department of the Treasury, *ante* note 3, at 684 (describing the Act's reference to "direct use, consumption, or dis-

position outside of the United States" as establishing a "destination test," and noting that a purpose of such a test is "to assure that DISC benefits are available only where there has been a true export").

**7.** Among the stipulations of the parties was that GEISCO qualified as a DISC at all relevant times.

jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

For the reasons stated below, we reverse the Tax Court's judgment as to the engines, vacate its judgment as to the reversers, and remand the cause for further proceedings consistent with this opinion.

## II. ANALYSIS

■ The Tax Court's conclusion that the engines and reversers were not export property within the meaning of § 993 was based entirely on the stipulated facts summarized above. Accordingly, there are no disputed facts here, and we review the Tax Court's judgment *de novo. See Marrin v. Commissioner,* 147 F.3d 147, 150 (2d Cir. 1998). We consider first the Tax Court's decision as to the engines and, then, its decision as to the reversers.

## A. THE ENGINES

■ As an initial matter, we must decide whether § 993 unambiguously supplies a rule of decision fine-grained enough so that it controls the "precise question" at issue here, *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—namely, whether the engines were "export property." If § 993 clearly supplies such a rule of decision, we must apply that rule, regardless of what the regulations might otherwise dictate. *See id.* If § 993 does not plainly supply a rule of decision, we must defer to the regulations.[8]

**8.** The question of *how much* we must defer to Treasury Department tax regulations that assertedly conflict with the statute that they purport to interpret is arguably unsettled: Some cases suggest that Treasury Department tax regulations are entitled to deference under *Chevron,* while others imply that such regulations are entitled to the deference described in *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 476–477, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979). *Compare, e.g., Bankers Life & Cas. Co. v. United States,* 142 F.3d 973, 982–83 (7th Cir.1998) (applying *Chevron* to tax regulations), *and Peoples Fed. Sav. & Loan Ass'n v. Commissioner,* 948 F.2d 289, 304–05 (6th Cir.1991) (same), *with Cottage Sav. Assn. v. Commissioner,* 499 U.S. 554, 560–61, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991) (citing *National Muffler,* but not *Chevron,* for the proposition that courts "must defer to [the Commissioner's] regulatory interpretations of the [Internal Revenue] Code so long as they are reasonable"), *and Atlantic Mut. Ins. Co. v. Commissioner,* 523 U.S. 382, 389, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998) (similar). *See generally Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 (holding that "legislative regulations are [to be] given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"); *National Muffler Dealers Ass'n,* 440 U.S. at 476, 99 S.Ct. 1304 (stating that courts must defer to regulations so long as they "implement the congressional mandate in some reasonable manner" (internal quotation marks omitted)).

In this case, we need not decide whether the regulations are entitled to deference under *Chevron* or *National Muffler.* Because the Commissioner does not argue that the regulations do not warrant deference, his position does not require us to determine how much deference to accord the regulations. Similarly, GE argues that the regulations do not warrant deference *only* if they are interpreted to compel the conclusion that the engines and reversers were not "export property." Because we hold that the engines were export property, *see post* at 159, and do not reach the question of whether the reversers were export property, *see post* at *id.,* we need not and do not decide whether the regulations are entitled to deference under *Chevron* or *National Muffler.* We express no opinion as to whether there is any practical difference between *Chevron* and *National Muffler. Compare, e.g., Bankers Life,* 142 F.3d at 982–83 (cataloguing potentially "important" differences between *Chevron* and *National Muffler* and collecting cases that suggest that the *National Muffler* standard is less deferential than the *Chevron* standard), *with Bell Fed. Sav. & Loan Ass'n v. Commissioner,* 40 F.3d 224, 227 (7th Cir.1994) (stating that any distinction between *Chevron* and *National Muffler* is "negligible at best"), *and Central Pa. Sav. Ass'n v. Commissioner,* 104 T.C. 384, 392, 1995 WL 138584 (1995) (suggesting that there might not be any differences between *Chevron* and *National Muffler,* and that if there are any

To determine whether the Revenue Act unambiguously supplies a controlling rule of decision, we begin with the language of § 993. *See, e.g., Korea Shipping Corp. v. New York Shipping Ass'n–Int'l Longshoremen's Ass'n Pension Trust Fund,* 880 F.2d 1531, 1537 (2d Cir.1989). Section 993 provides in relevant part that "export property" is property "held primarily for sale ... by ... a DISC, for direct use, consumption, or disposition outside the United States," and that phrase might plausibly be read in one of two relevant ways.

On the one hand, the adjective "direct" in § 993 can be read as applying *only* to the word that follows it: "use." *Cf.* WARNER'S ENGLISH GRAMMAR AND COMPOSITION: THE COMPLETE COURSE 9 (1986) (stating in a related context that "the normal position of an adjective is *directly before* the word it modifies" (emphasis added)). On this interpretation, export property is, *inter alia,* property held for "direct use," or for "consumption," or for "disposition" outside the United States, and the regulations would be irrelevant here because § 993 provides an on-point rule of decision: It is clear that the engines were held primarily for at least *eventual* "consumption" or "disposition" outside of the U.S. by the foreign airlines that bought the aircraft from Boeing and MDC and selected GE engines.

On the other hand, § 993 might be read so that "direct" modifies *each* of the nouns that follows it—not just "use," but "consumption" and "disposition" as well. *Cf. United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (assuming that the phrase "reasonable fees, costs, or charges" means that fees must be reasonable, costs must be reasonable, and charges must be reasonable); *United States v. Figueroa,* 165 F.3d 111, 114 (2d Cir.1998) (assuming that the phrase "knowingly aids or assists" means that aid must be knowingly provided and assistance must be knowingly provided). On this interpretation, the engines qualify as export property only if they were held for "*direct* use," or "[*direct*] consumption," or "[*direct*] disposition" abroad. § 993 (emphasis added).

It is far from clear, however, what the terms "direct use," "[direct] consumption," or "[direct] disposition" might mean, and there is no indication in the record that these terms have been invested with a definite meaning by industry practice or prior legislation. *See generally Atlantic Mut. Ins. Co.,* 523 U.S. at 388–389, 118 S.Ct. 1413 (holding that a term is ambiguous so that Department of the Treasury regulations must be consulted when the term's meaning is neither (1) obvious nor (2) established by prior statutes or industry custom). Moreover, how these terms are defined will determine whether the engines were or were not "export property." Accordingly, if § 993 is interpreted so that "direct" modifies "use," "consumption," and "disposition," the statute does not unambiguously supply an on-point rule of decision because it does not define "direct use," "[direct] consumption," or "[direct] disposition."

such differences they are "subtle"). Similarly, we express no view as to whether our prior references to *Chevron* deference in cases involving tax regulations were merely dicta, or whether they require us to apply *Chevron* in future cases in which the question of how much deference to accord Treasury Department tax regulations is properly and necessarily before us. *See Weil v. Retirement Plan Admin. Comm.,* 933 F.2d 106, 107–08 (2d Cir.1991) (citing *Chevron*); *Knapp v. Commissioner,* 867 F.2d 749, 752 (2d Cir.1989) (same); *cf. Fran Corp. v. United States,* 164 F.3d 814, 818 & n. 6 (2d Cir .1999) (citing *Chevron* as well as *Cottage Savings,* a *National Muffler* case).

In sum, standing alone, § 993 is materially ambiguous: It can be plausibly read in disparate ways, and how it is read will determine the outcome of this case.

■ Moreover, we can divine no indication in the legislative history of the Revenue Act as to whether "direct" should be understood to modify all of the nouns that follow it.[9] In addition, we reject the Commissioner's argument that the Act's legislative history demonstrates that Congress intended that items such as the engines should not be considered export property. The Commissioner notes that the relevant House and Senate Reports state that under the Revenue Act "a sale of property to an American manufacturer for incorporation in a product to be exported would not be considered ... an export sale." Reasoning from this sentence, the Commissioner asserts that the engines were "incorporat[ed]" into the airframes, and that the engines were exported, as part of fully assembled aircraft, only after being so "incorporat[ed]." Accordingly, the Commissioner contends, the engines cannot be considered export property.

We are not persuaded. Under some definitions of the verb "to incorporate," the Commissioner's argument might be convincing. *See, e.g.,* Appellee's Brief at 36 (citing AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992) (defining to "incorporate" as "[t]o unite (one thing) with something else already in existence")). However, on other definitions, the Commissioner's argument is plainly unavailing. For example, if, as GE maintains, to "incorporate" means to "unite with ... something already existent ... so as to form an indistinguishable whole that cannot be restored to the previously separate elements *without damage,*" Appellee's Brief at 25 n. 7 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1145 (1981) (emphasis added)), the engines were not "incorporate[d]" into the airframes because these were physically distinct products that were intended to be separable from one another without being damaged. *See, e.g.,* Stipulation ¶ 57 (noting that GE engines were routinely removed from the airframes to which they were initially attached for re-installation on other airframes).

■ Accordingly, even if we assume *arguendo* that legislative history may be considered for such purposes, *see ante* note 9, the House and Senate Reports are themselves too ambiguous to clarify definitively the meaning of § 993. We hold, therefore, that Congress did not speak to the "precise issue" of whether items like the GE engines at issue here are "export proper-

---

9. In an ordinary case involving statutory interpretation, when we read a statute and conclude that it is ambiguous, we may attempt to clarify the statute's meaning by referring to its legislative history. *See, e.g., Oklahoma v. New Mexico,* 501 U.S. 221, 235, 111 S.Ct. 2281, 115 L.Ed.2d 207 n. 5 (1991) (collecting cases). However, when we conclude that a statute as to which an Executive Branch agency has promulgated relevant regulations is ambiguous, it is unclear whether we should look to the statute's legislative history before deciding whether to consult the relevant regulations. *Compare, e.g., National R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 417–18, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (stating that regulations should be applied "[i]f the *text* [of the statute] is ambiguous" (emphasis added)), *with Chevron,* 467 U.S. at 842–45, 104 S.Ct. 2778 (holding that regulations should be applied if Congressional "intent"—as expressed in the text of a statute *and* in its legislative history—is ambiguous), *and FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 147–48, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (considering legislative history); *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 649–50, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (same). Here, we will assume *arguendo* that legislative history may be considered.

ty." In these circumstances, the regulations, to which we now turn, must be given "controlling weight." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. *See Young v. Community Nutrition Inst.*, 476 U.S. 974, 980–81, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (holding that where it is unclear which words in a statute are intended to modify another, the statute is ambiguous within the meaning of *Chevron* so that relevant regulations should be consulted).

 As noted above, pursuant to the destination test promulgated in the regulations, a firm may not claim DISC benefits on the basis of property that is "subject to use . . ., manufacture, assembly, or other processing (other than packaging)," Treas. Reg. § 1.993–3(d)(2)(iii), between its sale in the United States and its delivery outside of the United States. In other words, an item is "export property" if, *inter alia,* it meets each of two criteria. First, the item must not be for immediate domestic "use"—that is, it must not be used between the time it is sold in the United States and the time it is delivered abroad. Second, after it is sold, the item must be exported without first being subjected (or, in many cases, *further* subjected) to the processes whereby finished products are produced from their constituent parts—namely, "assembly," "manufacture," and their ilk ("other processing"). Accordingly, the item in question must be a *completed* export product from the moment it is sold—it must be sold in the form, though not necessarily in the package, *see* Treas. Reg. § 1.993–3(d)(2)(iii) (noting that export property may not be subjected to "other processing (*other than packaging*)") (emphasis added)), in which it will be delivered abroad.

In this case, the parties agree that the engines were not subject to any domestic use within the meaning of the regulations. *See* Stipulation ¶ 68. Moreover, they agree that the engines were "complete product[s]," *id.* ¶ 29, and that they were "fully assembled" and "fully processed" when they were sold by GE, *id.* ¶¶ 70, 71. The parties disagree only as to whether, by being attached to the airframes, the engines were subjected to further "assembly" or "processing."

We hold that they were not. The engines and the airframes were physically separate and distinct from one another. The GE engines, for example, were routinely removed from one airframe, and placed onto another, *see id.* ¶ 56, and "a typical GE Engine sold as part of a new Aircraft . . . would usually spend most of its useful life powering Aircraft other than the Aircraft to which it was originally attached," *id.* ¶ 57.

In addition to being physically separate entities, airframes and engines were and are recognized as legally distinct. For example, the Federal Aviation Administration ("the FAA"), separately tracks airframes and engines, and the Commissioner has recognized in a variety of contexts that engines and airframes are separate, discrete products. *See, e.g.*, Priv. Ltr. Rul. 82–44–030, 1982 WL 209760 (July 29, 1982) (noting that the Internal Revenue Service "treats aircraft engines as units of property separate from the airframe").

Finally, and most importantly, engines and airframes are viewed by the aviation industry as having "separate and independent identit[ies]," *General Elec. Co.*, 70 T.C.M. at 40; *accord* Stipulation ¶ 50 ("[t]he aviation industry views a GE Engine as retaining its independent identity throughout its entire useful life"), and they were treated as such by GE. GE actively solicited engine orders from foreign airlines, *see* Stipulation ¶ 16, and had "continuing contacts" with them, *id.* at ¶ 17. Moreover, whenever GE learned that an airline might be interested in purchasing a

GE engine for the first time, it sent sales representatives to meet with airline officials. *See id.* ¶ 18. At such meetings, GE representatives described the "advantages" of choosing a GE-built engine, and "would also typically negotiate the terms and provisions that would apply if the Airline decided to purchase [a] GE [engine]." [10] *Id.* GE representatives would then seek to reduce their negotiations with airline officials to a bilateral agreement between the airline and GE. *See id; cf. id.* ¶ 19 ("[W]henever [GE] learned an Airline was considering purchasing a new Aircraft from a major Airframe manufacturer, [GE] typically had personnel from its Sales and Marketing Department visit that Airline, to induce it to select GE [engines] for use on its new Aircraft. As an incentive for the Airline to select GE [engines], personnel from [GE's] Sales and Marketing Department offered to provide various discounts and/or allowances to the Airline, such as cash rebates, free parts . . . etc., if the Airline would agree to select GE [engines].").

In short, GE marketed its engines directly to foreign airlines, and independently of any marketing efforts that might have been pursued by Boeing or MDC; GE negotiated directly with foreign airlines as to the cost to the airlines of choosing a GE engine; .and GE executed bilateral agreements with foreign airlines that governed the terms under which their aircraft would be outfitted with GE engines.

GE engines and the airframes onto which they were installed were commercially distinct from one another not just in terms of marketing and sales, but in terms of warranties and repairs as well. Air-

frames and GE engines were subject to independent maintenance schedules, *see id.* ¶ 54, and after GE engines were removed from airframes for maintenance purposes, "they could be—but seldom were—remounted on the same [a]irframe from which they had been removed," *id.* ¶ 56. Warranties as to GE engines ran to the foreign airlines that purchased Boeing or MDC aircraft, and neither Boeing nor MDC provided an express warranty as to the engines—indeed, they disclaimed any implied warranty as to the engines. *See id.* ¶ 24. A division of GE kept track of warrantied GE engines, and large airlines submitted monthly reports to GE as to the status of their GE engines. Moreover, when alterations had to be made to a particular GE engine, GE dealt directly with airlines that owned such engines, *see id.* ¶¶ 26–28, and sold replacement engine parts to airlines that had previously acquired GE engines without any involvement from Boeing or MDC. *See id.* ¶ 61.

In sum, GE engines and the airframes to which they were appended were wholly separate and distinct from one another. Accordingly, when Boeing and MDC installed the engines on the airframes, the firms were not moving the engines along toward completion, or even substantially changing them. *See ante* at 157 (noting that to satisfy the destination test, an item must not, *inter alia*, be subject to the processes whereby finished products are produced from their constituent parts between the item's sale in the United States and its delivery abroad). Rather, Boeing and MDC were simply affixing a completed export product (an engine that was itself already in the form in which it was to be delivered abroad) to another product

---

**10.** GE officials seem to have conducted such bilateral negotiations with airline customers concerning GE reversers, as well as GE engines. *See* Stipulation ¶ 18. Although GE engines and reversers were therefore similar in this and other respects, because of potentially material differences between them, *see post* at 159, we treat the engines and reversers separately from one another.

(an airframe). By doing so, Boeing and MDC did not subject the engines to either "assembly" or "other processing." *See id.* (noting that under the regulations an item is not subject to "assembly" or "other processing" if it is sold as a completed export product—that is, if it is sold in the form in which it will be delivered abroad). Accordingly, we hold that the engines constituted export property. We therefore reverse the Tax Court's judgment as to the engines, and remand the cause for entry of judgment in favor of GE. *See* Stipulation ¶ 73(b) (specifying the tax refund to which GE would be entitled if the engines "qualif[ied]" as "export property").

## B. THE REVERSERS

■ The Tax Court held also that the reversers were not export property. In reaching this conclusion, however, the Tax Court did not differentiate between reversers and engines, *General Elec. Co.*, 70 T.C.M. at 42–43, and although the engines and reversers were similar in some respects, *see, e.g., ante* note 10, we perceive a number of potentially material differences between them. For example, while engines and airframes are viewed as distinct entities by the aviation industry, *see* Stipulation ¶ 50, "the aviation industry views a Thrust Reverser *as part of an Airframe* throughout its useful life," *id.* ¶ 51 (emphasis added); *see also id.* App. A (defining "Airframe" as consisting in part of reversers). Because the Tax Court did not differentiate between engines and reversers, we vacate its judgment as to the reversers, and remand the cause to the Tax Court so that it can consider in the first instance whether the reversers constituted export property.

We vacate and remand the Tax Court's decision, rather than affirm it or reverse it based on the stipulated facts, for two reasons. First, the DISC program occupies a relatively dark corner of tax law that has not been illuminated by many decided cases. *Cf. Sim–Air, USA, Ltd. v. Commissioner,* 98 T.C. 187, 192, 1992 WL 31252 (1992) ("The statute and regulations governing DISC[ ]s are a baffling maze . . . ."). We are convinced that the development of the law in this area should take place incrementally, and with the full benefit of the Tax Court's considerable expertise. Second, we believe that in light of our decision as to the engines the parties might find it useful to supplement the factual record as to the reversers. Remanding the cause will give them an opportunity to do so.

## III. CONCLUSION

To summarize:

(1) As to the engines, we hold (a) that the Act is, in relevant part, ambiguous, and that we must therefore defer to the regulations; and (b) that under the pertinent regulations the engines were not "subject[ed] . . . to . . . assembly . . . or other processing," Treas. Reg. § 1.993–3(d)(2)(iii), by being attached to the airframes by Boeing or MDC. Accordingly, we reverse the Tax Court's judgment as to the engines, and remand the cause for entry of judgment as to the engines in favor of GE.

(2) As to the reversers, we note (a) that the Tax Court did not differentiate in its analysis between engines and reversers and (b) that there are potentially material differences in this context between them. Accordingly, we vacate the Tax Court's judgment as to the reversers, and remand the cause for further consideration in light of this opinion.